**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| Jane Doe (C.L.F.), an individual<br>Plaintiff<br><br>v.<br><br>G6 HOSPITALITY, LLC,<br>G6 HOSPITALITY IP, LLC,<br>G6 HOSPITALITY PROPERTY, LLC,<br>G6 HOSPITALITY PURCHASING, LLC,<br>G6 HOSPITALITY FRANCHISING, LLC,<br>MOTEL 6 OPERATING, L.P., AND<br>KISAN, INC. | CIVIL ACTION NO: |

## ORIGINAL COMPLAINT

COMES NOW Plaintiff Jane Doe (C.L.F.), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## SUMMARY

1.      Jane Doe (C.L.F.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

3.      Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation,

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] 18 U.S.C. §1591(e)(3).

1

lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (C.L.F.), with minimal risk of detection or interruption.

8.      Defendants continued supporting traffickers, including Jane Doe (C.L.F.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotels and specifically at the Motel 6 located at 5736 W Kellogg Dr. Wichita, KS 67209. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

9.    Jane Doe (C.L.F.) is a natural person who is currently a resident and citizen of Kansas.

10.    Defendant G6 Hospitality LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

11.    Defendant G6 Hospitality IP, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

12.    Defendant G6 Hospitality Property, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

13.    Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

14.    Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

15.    Defendant Motel 6 Operating, LP is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

16.    Defendants G6 Hospitality LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating,

LP will collectively be referred to as "G6", "G6 Defendants" or "Franchisor Defendants." Upon information and belief, they owned, operated, controlled, and/or managed the Motel 6 located at 5736 W Kellogg Dr. Wichita, KS 67209.

17.     Defendant Kisan, Inc. is a Kansas for profit corporation with its principal place of business in Kansas. It may be served through its registered agent Hemang Patel, 119 N. Belle Terre, Wichita, KS 67230. Kisan, Inc. will be referred to as "Franchisee Defendant." Upon information and belief, it owned, operated, controlled, and/or managed the Motel 6 located at 5736 W Kellogg Dr. Wichita, KS 67209.

## JURISDICTION AND VENUE

18.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Eastern District of Texas, and all Defendants are residents of Texas.

20.     All of the G6 Defendants have the same principal place of business, which is in Carrolton, Texas, within the Eastern District of Texas. Therefore, each of the G6 Defendants is a resident of the Eastern District of Texas for the purpose of § 1391(b)(1).

21.     Under 28 U.S.C. §§ 1391(c)(2), Franchisee is a resident of Texas for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over Franchisee.

22.     Under 28 U.S.C. §§ 1391(d), Franchisee is a resident of Texas for the purpose of § 1391(b)(1) because if the Eastern District of Texas were a separate state, Franchisee's contacts with the district would be sufficient to subject it to personal jurisdiction.

23.    Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Texas.

24.    Plaintiff's claims against Franchisee arise out of Franchisee's contacts with Texas through Franchisee's relationship with the G6 Defendants, which have their principal place of business in the Eastern District of Texas. Franchisee's participation in a venture with the G6 Defendants operating the subject motel occurred, in substantial part, in Texas because:

    a.  Upon information and belief, Franchisee actively sought out a franchising relationship by contacting the G6 Defendants in Texas.

    b.  Franchisee acknowledged that the negotiation, execution, and acceptance of the franchising agreement occurred in the Eastern District of Texas.

    c.  Franchisee agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas.

    d.  The franchising agreement had a choice of law provision selecting the law of Texas as the governing law.

    e.  The franchising agreement required Franchisee to report information to the G6 Defendants in Texas, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like Jane Doe (C.L.F.).

    f.  Franchisee agreed to submit all notices required under the franchising agreement to the G6 Defendants in the Eastern District of Texas.

    g.  Franchisee was required to attend training and meetings in Texas.

    h.  The G6 Defendants dictated policies related to safety, security, human trafficking, employee training, and other subjects from their principal place of business in the Eastern District of Texas.

    i.  Franchisee had an ongoing obligation to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas.

    j.  Franchisee was required to purchase insurance on behalf of one or more Texas entities (the G6 Defendants).

k. Upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by G6 from its principal place of business in Texas.

l. Upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by Franchisor in Texas

m. The benefit that Franchisee received from room rentals was governed by the Texas franchising agreement.

n. Franchisee agreed to make all payments due under the franchising agreement at the G6 principal place of business in the Eastern District of Texas.

o. Franchisee's operation of the subject motel was controlled and/or influenced by many policies set and enforced by the G6 Defendants from their principal place of business in Carrollton, Texas.

p. Franchisee signed a software licensing agreement with the G6 Defendants for the property management software the G6 Defendants required Franchisee to use when operating the motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms. Franchisee agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## FACTS

**I.    Jane Doe (C.L.F.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendants.**

25.    Jane Doe (C.L.F.) met her trafficker at a gas station in 2012. Her trafficker acted like he was her boyfriend for a few months but then he threatened her with abuse if she did not start engaging in commercial sex acts for his financial benefit.

26.    From 2012–2013, Jane Doe (C.L.F.)'s trafficker repeatedly trafficked her. He was abusive towards her, and she feared him.

27.    Between January 2012 and August 2013, Jane Doe (C.L.F.) was trafficked at the Motel 6 located at 5736 W Kellogg Dr. Wichita, KS 67209.

28.     Jane Doe (C.L.F.)'s sexual exploitation repeatedly occurred in rooms of the Motel 6 and was facilitated by G6 and Franchisee Defendant.

29.     Between January 2012 and August 2013, Jane Doe (C.L.F.) was trafficked over fifty times at this Motel 6.

## II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

30.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendant(s) knew or should have known regarding the trafficking at their hotel properties, including the trafficking of Jane Doe (C.L.F.).

31.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[3] For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[4] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[5] Hotels have been found to account for over 90% of commercial exploitation of children.[6]

32.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

---

[3] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[4] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[5] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[6] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

33.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[7]

34.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[8]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

---

[7] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

[8] *See Id.*

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

35.    The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion. It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

36.    The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[9]

37.    All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and

---

[9] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

38.    The most effective weapon against sexual exploitation and human trafficking is education and training.[10]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[11]

39.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[12]   In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

40.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent

---

[10] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[11] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[12] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

41.    Each of the Franchisor Defendants and Franchisee Defendant(s) had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

42.    Unfortunately for Jane Doe (C.L.F.), the promises made by the Franchisor Defendants and Franchisee Defendant(s) have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (C.L.F.).

### III.    Sex Trafficking Has Long Been Prevalent at Motel 6 Branded Properties, and Defendants Have Known About It.

43.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (C.L.F.)'s trafficking, that sex trafficking was ongoing and widespread at Motel 6 branded properties including the subject property.

44.    Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[13]

45.    A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los

---

[13] Sarah Meo and Louise Shelley, *Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility* (Nov. 11, 2021), https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility.

Angeles.[14] From this lawsuit, G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking.[15]

46.     G6 intentionally ensures its hotels are "strategically located . . . close to airports, freeways, and other thoroughfares" making them attractive venues for trafficking and compelled prostitution.[16]

47.     Public statements of the G6 Defendants confirm that they knew that sex trafficking is a problem in the hotel industry and that they retained control over the response of their branded hotels to this problem. The G6 Defendants recognize that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[17] They also acknowledged the significant role G6 has in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels.[18]

### a. Sex Trafficking at Motel 6 Branded Hotels was well Known by Defendants.

48.     Upon information and belief, each of the Defendants monitored criminal activity occurring at Motel 6 branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel property where Jane Doe (C.L.F.) was trafficked.

---

[14] *Motel 6 pays $250,000 to settle human trafficking suit* (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.
[15] *Id.*
[16] *Motel 6 – An Iconic American Brand*, https://g6hospitality.com/our-brands/#about-motel-six (last visited Aug. 10, 2023).
[17] *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf
[18] *Id.*

49.     Scores of news stories from across the US highlight G6's facilitation of sex trafficking and certainly establishes that Defendants knew, or should have known, of the use of Motel 6 hotels for sex trafficking.

50.     Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of Motel 6 hotels for illegal activity, the following was noted:

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[19]

- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[20]

- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[21]

- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[22]

- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[23]

- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[24]

---

[19] Amy Fine Collins, *Sex Trafficking of Americans: The Girls Next Door,* Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.

[20] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[21] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[22] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

[23] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[24] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[25]

- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[26]

- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[27]

- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[28]

- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[29]

- In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[30]

- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[31]

- A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[32]

---

[25] *Suspects Busted in Anaheim Sex Ring,* ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[26] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity/.

[27] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[28] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

[29] Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/

[30] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel,KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.

[31] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

[32] Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-22city/21922915/.

- In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[33]

- A local law enforcement investigation resulted in the rescue of a fifteen (15) year old runaway in February 2015, from a Motel 6 near the Oakland, California airport where she was being sex trafficked.[34]

- In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[35]

- Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[36]

- In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[37]
- Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[38]

- Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[39]

- In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[40]

---

[33] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

[34] Emilie Raguso, Woman Charged In Berkeley Teen Sex Trafficking Case (Dec. 8, 2015), https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case.

[35] Melissa Boughton, Police Say Teen Starved, Beaten at North Charleston Hotel; Man Arrested in Sex-Trafficking Case (Mar.2, 2015), https://www.postandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston-motel-man/article_032153eefcb6-5333-9182-926a7f43dfbf.html.

[36] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[37] Amanda Milkovits, Massachusetts Man Accused Of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[38] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015),https://www.washingtonpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[39] Hsing Tseng, Seven Indicted By Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex- trafficking-ring-bust/.

[40] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[41]

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[42]

- In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[43]

- In November 2015 a man was arrested at a Motel 6 in Ventura, California and was criminally charged with sex trafficking a fifteen (15) year old girl who was found with him.[44]

51.    Based on information and belief, the G6 Defendants and Franchisee Defendant managed and monitored on-line reviews of Motel 6 hotel locations:

- 2010 TripAdvisor review out of Maine states "[M]y tour group and I figured that we should just stay here considering we were only staying here one night...There was dirtbags hanging around the pool area, and in the little yard area on the side. It looked as if all of the people who LIVED THERE were on drugs by the way they talked! Also during my stay there we saw a prostitute who must have been living there! She looked anorexic and came into the lobby telling the receptions that the cops might be coming so tell her if they show up! (i am not making any of this up) there was also "a security guard" there waiting in the lobby all day and throughout the night making sure that the prostitute did not leave. They told the receptionist that the prostitute had 2 clients upstairs..."[45]

- 2011 Yelp review in California states "…We paid to spend two night, but after one night of being terrorized by pimps, prostitutes, "druggies" and homeless sleeping in cars we checked out…Our lasting memory should be the beautiful wedding, but instead it will be know as our night of terror. The management is well aware of this and contribute to the problem by renting rooms to these terrorist..."[46]

---

[41] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[42] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, NewsMississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

[43] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

[44] Fresno Man Sentenced To Prison For Pimping, Human Trafficking In Ventura County, Ventura County Star (Apr. 26, 2016), https://www.vcstar.com/story/news/local/communities/ventura/2016/04/26/fresno-man-sentenced-to-prison-for-pimping-human-trafficking-in-ventura-county/88714698/.

[45] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danvers-Danvers_Massachusetts.html

[46] https://www.yelp.com/biz/motel-6-santa-rosa-south-santa-rosa

- 2011 TripAdvisor review from California states "…After watching the pedestrian and vehicle traffic for a period of time in the immediate area, it is apparent that the staff does not decline service to prostitutes w/ their protection (pimps) and drug dealers...While the affordable rates are the draw, once your there, you'll realize that Corporate hasn't paid attention to what occurs there or doesn't care as long as the money keeps coming in."[47]

- 2011 Yelp review from California states "Sheets and towels are frequently stained. Prostitution is a problem at this location, leading me to believe management and the staff (who are very friendly with the hookers) turns a blind eye to it to fill rooms or is being paid to look the other way…"[48]

- 2012 TripAdvisor review from Colorado states "…The first night, I received phone call after phone call, asking if I wanted "sexual favors" done to me. NO!!!!!! I also witnessed numerous drug dealings going on, and had my door banged on several times…Upon checkout, I explained issues to the clerk (the same person who checked me in) and she said, oh well…"[49]

- 2012 Yelp review out of Texas states "Do not stay here. Just stayed here and had some shadey stuff goin on…for one the hotel is a front for a prostitution ring the owners are running…I turned down one of the girls who in which called my room phone and asked if I wanted company and soon after had one with purple hair and what looked like her pimp at my door. I didn't answer I just watched through the peep hole. after they knocked for about 5 mins they left. As soon as I got comfortable I hear someone messing with my door and I look through the peep hole and they are back and are trying to use a key.. woooow..."[50]

- 2012 Yelp review from California states "what to say about the "no tell motel sex" lol sad but true...my neighbor had people as in men in and out all night long if you get my drift, and when i called the front desk they said they would check it out and never did…"[51]

- 2012 TripAdvisor review out of Illinois states "I have recently been relocated with my job out here so looking for a place in glenview area. I stood here for a week. They had pimps and prostitution going on next door, under and across from me my whole week hear. I told front desk of the noise and loud banging they were making all day and night long. The front desk called one room where they were in the prostitute got rude with her you can hear it they were told to check out but the same

[47] https://www.tripadvisor.com/Hotel_Review-g32810-d78752-Reviews-Motel_6_Oakland_Airport-Oakland_California.html
[48] https://www.yelp.com/biz/motel-6-salinas
[49] https://www.tripadvisor.com/Hotel_Review-g33388-d83061-Reviews-Motel_6_Denver_Central_Federal_Boulevard-Denver_Colorado.html
[50] https://www.yelp.com/biz/motel-6-dallas-4
[51] https://www.yelp.com/biz/motel-6-escondido?start=60

day they checked back in next door to me. Staff here must be in on it some how cause I watched a pimp and a few under age girls go in and out a few rooms across and next to me all night long with custermers. The following morning around 5am I was woken to a girl in the hall yelling at the pimp who just hit her. It gets better I guess staff told them I made a complaint so then after they were banging on my door and getting rooms next to me as well making extreme noise so they can get me out..."[52]

- 2013 TripAdvisor review from New York states "If you like drugs and drug addicts and drug dealing and prostitutes, this is the place to go. Not only do these people live in the hotel and use it as a place of business, but some of the staff is involved in drug dealing as well…"[53]

52.     This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (C.L.F.) was trafficked at the subject property, the G6 Defendants knew or should have known that:

   a.  There was widespread and ongoing sex trafficking occurring at Motel 6 branded properties.

   b.  Sex trafficking was a brand-wide problem for Motel 6 originating from management level decisions at their corporate offices in Carrollton, Texas.

   c.  Motel 6 franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

   d.  Motel 6's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

   e.  Motel 6 and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

53.     Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, G6 continued to earn revenue by continuing conduct that they knew or should have known would continue to facilitate that trafficking.

---

[52] https://www.tripadvisor.com/Hotel_Review-g36052-d243950-Reviews-Motel_6_Chicago_North_Glenview-Glenview_Illinois.html
[53] https://www.tripadvisor.co.nz/Hotel_Review-g29810-d93070-r172297063-Motel_6_Amherst_NY_Buffalo-Amherst_New_York.html

**b. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Motel 6 located at 5736 W Kellogg Dr. Wichita, KS 67209.**

54.     G6 and Franchisee Defendant were specifically aware that sex trafficking was widespread and ongoing at the subject Motel 6.

55.     For over a decade, Wichita has been recognized as major originating cities for human trafficking.[54] According to the FBI Wichita is the 5th originating city in America for human trafficking.[55] G6 and Franchisee Defendant knew that the subject Motel 6 was in a high-crime area with a known history of reports of sex trafficking.

56.     Internet reviews for the subject Motel 6, which upon information and belief the G6 Defendants and Franchisee Defendant manage and monitor, show the pervasiveness of sex trafficking before and well after Jane Doe (C.F.L.) was trafficked. For example:

- 2009 Yelp review states "That said...guests beware. I have heard what I thought to be gunshots (I wasn't about to stick my head out the door to confirm, flashing lights and walkie talkie chatter afterwards makes me think that either it was, or someone else had the same thought as me); discovery of discarded drug ampules & blank prescription containers in the courtyard and parking lot…entertainment besides the free HBO, is listening to the late night check-in trysts (this, my friends, is what earplugs are for), and a bonus of catching parts of conversations regarding what seemed to be discussions of business" from female to male clients. Do yourself a favor. Don't stay here." [56]

- 2012 TripAdvisor review states "There was a prostitute (who was not shy about her intentions) across the way. It was loud and filled with shady people. Very sinister. The last straw was when I had to hide in my bathroom because someone was banging on the door next door, yelling about knowing someone was in there and give them their money."[57]

- 2016 Google review states "I FEARED FOR MY LIFE AT THIS HOTEL. DRUG DEALERS AND PROSTITUTES EVERYWHERE. MY CHILDREN WITNESS GIRLS ENTERING ROOMS IN JUST BRA AND PANTIES AS THEIR PIMP STOOD OUTSIDE

---

[54] *Topic: Human Trafficking in Kansas* (Jan. 17, 2012),
http://www.kslegislature.org/li_2012/b2011_12/committees/misc/ctte_h_corr_juv_jus_1_20120117_05_other.pdf.
[55] Invisible People, Kansas Human Trafficking and the Commercial Sexual Exploitation of Children and Youth (July 29, 2010), https://invisiblepeople.tv/kansas-human-trafficking-and-the-commercial-sexual-exploitation-of-children-and-youth/.
[56] https://www.yelp.com/biz/motel-6-wichita
[57] https://www.tripadvisor.com/Hotel_Review-g39143-d601951-Reviews-Motel_6_Wichita_KS-Wichita_Kansas.html

DOOR. WE WILL NEVER VISIT ANOTHER MOTEL 6 AGAIN. MY HUSBAND WAS STALKED BY PROSTITUTES. [58]

- 2017 Google review states "I'm not hard to please and I don't judge a place based on how many drug dealers and prostitutes hanging out in the lobby. But at the very least the wads of pube hair that littered the entire room could have been cleaned up, I mean damn it's not that difficult! [59]

- 2018 Google review from the Motel 6 in Topeka, Kansas states "This place is unbelievable. We checked in and 10 minutes after got there the cops were knocking on our door telling us this place was known for drugs, trafficking, etc.." [60]

- 2019 Google review states "Phone does not work door handle came off of room door an ac don't work an lots of drugs use an saleing sex.[61]

- 2019 Google review states "There were hookers and drugs throughout the hotel the first room was dirty with hair on the bed and we had to loves to another room. [62]

- 2020 Expedia review from the Motel 6 in Topeka, Kansas states "Checked in, went to unload luggage and the police roll through the parking lot. Not the best sign. About an hour in the room the bang comes knocking on the door. I suspect some tweakers with the wrong room number. Then couple hours later the local prostitutes gathered in front of my room to discuss their clients..." 63

- 2021 Booking.com review from the Motel 6 in Topeka, Kansas states "Had roaches, prostitutes and drugs deals going on all night." [64]

---

[58]https://www.google.com/travel/hotels/AJR%20Investments,%20LLC%20d%2Fb%2Fa%20Motel%206%205736%20W%20Kellogg%20Dr,%20Wichita,%20KS%2067209/entity/CgoI5aO8sprP...

[59]https://www.google.com/travel/hotels/AJR%20Investments,%20LLC%20d%2Fb%2Fa%20Motel%206%205736%20W%20Kellogg%20Dr,%20Wichita,%20KS%2067209/entity/...

[60].https://www.google.com/travel/hotels/Vaibhavlaxmi,%20LLC%2FValam,%20LLC%2FVali,%20LLC%20d%2Fb%2Fa%20Motel%206%20709%20SW%20Fairlawn%20Rd,%20Topeka,%20KS%2066606%20google/entity/CgoI3uOIvPPU1_JIEAE/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4906019,4926165,4926489,4931360,4934309,4934342,4936396,4937897,4940606,4942346,47061553&hl=en-US&gl=us&ssta=1&q=Vaibhavlaxmi,+LLC/Valam,+LLC/Vali,+LLC/d/b/a+Motel+6+709+SW+Fairlawn+Rd,+Topeka,+KS+66606+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGBcSBwjnDxACGBggADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg3YmVmZDlkOWU4ZDQ1YTk6MHg0OGU1NWVhNzM3ODIzMWRl&rp=EN7jiLzz1NfySBDe44i889TX8kg4AkAASAHAAQI&ictx=1

[61]https://www.google.com/travel/hotels/AJR%20Investments,%20LLC%20d%2Fb%2Fa%20Motel%206%205736%20W%20Kellogg%20Dr,%20Wichita,%20KS%2067209/entity/CgoI5aO8sprP-61vEAE/reviews…

[62]https://www.google.com/travel/hotels/AJR%20Investments,%20LLC%20d%2Fb%2Fa%20Motel%206%205736%20W%20Kellogg%20Dr,%20Wichita,%20KS%2067209/entity/...

[63]https://www.expedia.com/Topeka-Hotels-Motel-6-Topeka.h996339.Hotel-Reviews

[64]https://www.booking.com/hotel/us/motel-6-topeka-northwest.html

- 2022 Yelp review states " It is run down. They are trying to update it. However, the typical clients are not making it easy. From the balcony pot smokers to the midnight rap parties to the hookers trolling the pool and the people camping in the parking lot, it will be a difficult climb out of this getto.[65]

- 2023 Booking.com Review states "The location was difficult to get to, lots of drug dealing and prostitution at the hotel. There was blood on the walls along with general damage to everything. [66]

57.    Traffickers, including Jane Doe (C.L.F.)'s trafficker, repeatedly chose to use the Motel 6 for their sex trafficking activity. As such, G6 and Franchisee Defendant also knew or should have known about the pervasive sex trafficking at the Motel 6 based on obvious indicators of this activity.

58.    All knowledge from the staff at the Motel 6 is imputed to Franchisee Defendant. Franchisee Defendant knew about this widespread and ongoing trafficking at the Motel 6, including the trafficking of Jane Doe (C.L.F.), through the direct observations of hotel staff, including management-level staff.

59.    Upon information and belief, the Defendants knew or should have known about the widespread trafficking at the Subject Motel 6, based on:

    a.  The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

    b.  The Defendants' regular monitoring of online reviews;

    c.  The Defendants' collection and monitoring of customer surveys and complaints;

    d.  The Defendants' regular inspections of the hotel property;

    e.  Information provided to Defendants by law enforcement; and

    f.  Other sources of information available to Defendants.

---

[65] https://www.yelp.com/biz/motel-6-wichita
[66] https://www.booking.com/hotel/us/motel-6-wichita-airport.html

**c. Defendants knew Jane Doe (C.L.F.)'s was being trafficked at the Motel 6 because of the apparent and obvious "red flags" of sex trafficking.**

60.     During the period that Jane Doe (C.L.F.) was trafficked at the Motel 6, there were obvious signs that her trafficker was engaged in sex trafficking:

a.  The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards.

b.  Other girls were trafficked at the same hotel at the same time as Jane Doe (C.L.F.).

c.  Even though Jane Doe (C.L.F.) and her trafficker would stay for multiple days at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger.

d.  Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services.

e.  The trafficker was often present with Jane Doe (C.L.F.) at check in and would linger around the hotel or in the parking lot while she was with a john.

f.  There was heavy foot traffic in and out of Jane Doe (C.L.F.)'s room involving men who were not hotel guests.

g.  Jane Doe (C.L.F.) had at least ten (10)  johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

h.  Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

61.     Based upon information and belief, multiple employees at the Motel 6, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

62.     As such, Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (C.L.F.) was being trafficked at the subject Motel 6 property.

63.     Given these obvious signs, G6 knew or should have known about the trafficking of Jane Doe (C.L.F.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

IV.     **Defendants actively facilitated sex trafficking at the Motel 6, including the trafficking of Jane Doe (C.L.F.)**

64.     G6 and Franchisee Defendant had both actual and constructive knowledge of the trafficking of Jane Doe (C.L.F.) at the Motel 6 because the trafficking was the direct result of G6 and Franchisee Defendant facilitating her trafficking at the Motel 6.

     a.     **Franchisee Defendant facilitated the trafficking of Jane Doe (C.L.F.).**

65.     Franchisee Defendant is responsible for the acts, omissions, and knowledge of all employees of the Motel 6  when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee Defendant ratified these acts and omissions, and because Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendant, of sex trafficking occurring at Motel 6 branded locations including the subject location.

66.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Motel 6, Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

67.     Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (C.L.F.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (C.L.F.)'s sexual exploitation.

68.     Franchisee Defendant also facilitated widespread trafficking at the Motel 6, including the trafficking of Jane Doe (C.L.F.), in ways including:

     a.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

23

b.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

c.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**b.    The G6 Defendants facilitated the trafficking of Jane Doe (C.L.F.).**

69.    Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the subject Motel 6 that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (C.L.F.), as follows:

a.  The G6 Defendants have publicly assumed responsibility and control over the human trafficking response of all Motel 6 properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

b.  The G6 Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded hotels.

c.  The G6 Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the G6 Defendants. The G6 Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

d.  The G6 Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

e.  The G6 Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking

f.  The G6 Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The G6 Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training.

24

g.  Although they delayed making any reasonable effort to do so, the G6 Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity.

h.  The G6 Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Motel 6 properties, including suspected trafficking incidents.

i.  The G6 Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Motel 6.

j.  The G6 Defendants maintained control over all details of the terms under which franchised hotels, including the Subject Motel 6, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The G6 Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject Motel 6.

k.  The G6 Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Subject Motel 6, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

l.  The G6 Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject Motel 6, including trends that would reveal patterns consistent with human trafficking.

70.  G6 directly participated in and retained day-to-day control over renting rooms at the Motel 6 by, among other things:

a.  The G6 Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

b.  The G6 Defendants directly made reservations for rooms at the Subject Motel 6 and accepted payment for those rooms through a central reservation system that they controlled and operated. The G6 Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement.

25

c. The G6 Defendants established and maintained control over a brand-wide "do not rent" system. The G6 Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject Motel 6 through detailed policies that it established regarding use of this "do not rent" system.

d. The G6 Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

e. The G6 Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation.

f. The G6 Defendants controlled and oversaw policies and procedures regarding check-in, payment and identity verification procedures.

g. The G6 Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Motel 6.

h. The G6 Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Motel 6 until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

i. The G6 Defendants required franchisee to use G6's property management system, which was owned, maintained, controlled, and operated by the G6 Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

71.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Motel 6, G6 continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (C.L.F.).

72.    G6 knew or should have known that Jane Doe (C.L.F.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (C.L.F.)'s sexual exploitation.

73.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Motel 6, the G6 Defendants continued participating in a

venture at that hotel, with its franchisee and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

    a.  The G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking.

    b.  The G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training.

    c.  The G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties.

    d.  The G6 Defendants implicitly approved decisions by franchisee and hotel staff not to report or respond to criminal activity including sex trafficking appropriately.

    e.  The G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Subject Motel 6.

    f.  The G6 Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

    g.  Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the subject Motel 6, the G6 Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties.

    h.  The G6 Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner.

    i.  The G6 Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

    j.  The G6 Defendants provided traffickers with access to internet services in a manner that the G6 Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

74.    If G6 had exercised reasonable diligence when operating the Motel 6 and in the areas where it retained control, G6 would have prevented the Motel 6 from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.L.F.). Instead, G6 engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.L.F.).

## V.    Defendants' ventures at the Motel 6.

75.    Through the conduct described above, G6 and Franchisee Defendant knowingly benefited from engaging in a venture with sex traffickers at The Motel 6, including Jane Doe (C.L.F.)'s trafficker, as follows:

a. G6 and Franchisee Defendant both received benefits, including increased revenue, every time a room was rented at the Motel 6.

b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Motel 6, which G6 and Franchisee Defendant knew or should have known about.

c. G6 and Franchisee Defendant associated with traffickers, including Jane Doe (C.L.F.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d. G6 and Franchisee Defendant had a mutually beneficial relationship with the traffickers at the Motel 6, fueled by sexual exploitation of victims, including Jane Doe (C.L.F.).

e. Sex traffickers, including Jane Doe (C.L.F.)'s traffickers, frequently used the Motel 6 for their trafficking because of an implicit understanding that the Motel 6 was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of G6 and Franchisee Defendant facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for G6 and Franchisee Defendant.

f. Both G6 and Franchisee Defendant participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

28

g.  Jane Doe (C.L.F.)'s trafficking at the Motel 6 was a result of G6 and Franchisee Defendant's participation in a venture with criminal traffickers. If G6 and Franchisee Defendant had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (C.L.F.)'s trafficking at the Motel 6.

76.  Through the conduct described above, G6 also knowingly benefited from engaging in a commercial venture with Franchisee Defendant operating the Motel 6 as follows:

a.  G6 associated with Franchisee Defendant to operate the Motel 6.

b.  Pursuant to the terms of the franchising agreement, both G6 and Franchisee Defendant received financial benefits from operating the Motel 6, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c.  By participating in a venture that facilitated sex trafficking, each G6 and Franchisee also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Subject Motel 6 specifically.

d.  This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of Franchisee Defendant and the widespread sex trafficking at the Motel 6.

e.  Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), G6 participated in the venture by continuing to associate with Franchisee Defendant to operate the Motel 6 in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (C.L.F.).

f.  Jane Doe (C.L.F.)'s trafficking at the Motel 6 was a result of G6's and Franchisee Defendant's facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Motel 6. Had G6 not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), it would not have received a benefit from Jane Doe (C.L.F.)'s trafficking at the Motel 6.

**VI.    Franchisee Defendant and the Staff at the Motel 6 Acted as Actual Agents of G6.**

77.  G6 is vicariously liable for the acts, omissions, and knowledge of G6 and staff at the Motel 6, which are G6's actual agents or subagents.

78.    The G6 Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Motel 6 through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the G6 Defendants.

79.    The G6 Defendants obscure the full extent of control they exercise over the franchisee by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the G6 Defendants imposed on the franchisee:

    a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Motel 6;

    b.  covered virtually all aspects of hotel operations, including internal operating functions;

    c.  dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Motel 6; and

    d.  significantly exceeded what was necessary for G6 to protect its registered trademarks.

80.    In addition to the ways described above, upon information and belief, G6 exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Motel 6, including the following ways:

    a.  The G6 Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the G6 Defendants to protect their registered trademarks.

    b.  The G6 Defendants provided training for hotel management and select hotel staff on-site at the Subject Motel 6 and at locations selected by the G6 Defendants.

    c.  The G6 Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained.

d.  The G6 Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used.

e.  The G6 Defendants retained sole discretion to determine whether all training had been completed satisfactorily.

f.  For certain products and services that franchisee was required to purchase to operate the Subject Motel 6, the G6 Defendants designated approved vendors and prohibited franchisee from purchasing goods and services from anyone other than an approved vendor.

g.  The G6 Defendants required franchisee to sign a technology agreement governing the terms under which franchisee must procure and use technical services and software while operating the Subject Motel 6. Franchisee was required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel.

h.  The G6 Defendants set required staffing levels for the Subject Motel 6.

i.  The G6 Defendants established detailed job descriptions for all positions in its Motel 6 properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

j.  The G6 Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions.

k.  The G6 Defendants provided benefits for employees of franchised hotels.

l.  The G6 Defendants required Defendant Franchisee to use a customer resource management program maintained and operated by the G6 Defendants.

m.  The G6 Defendants controlled channels for guests to report complaints or provide feedback regarding the Subject Motel 6 and directly participated in the response and/or supervised and the response to customer complaints or other feedback. The G6 Defendants retained the right to provide refunds or other compensation to guests and to require Defendant Franchise to pay associated costs.

n.  The G6 Defendants generated reports and analysis of guest complaints and online reviews for the Subject Motel 6.

o.  The G6 Defendants required Defendant Franchisee to use a Guest Relations Application owned, operated, and maintained by the G6 Defendants to manage all

guest data and information. The G6 Defendants could use the backend of this system to analyze data and generate reports.

p.  The G6 Defendants set detailed requirements for insurance that franchisee must purchase and retained the right to purchase insurance for franchisee and to bill franchisee directly for that insurance if the G6 Defendants determined that the franchisee has not purchased adequate insurance.

q.  The G6 Defendants regularly audited the books and records of Defendant Franchisee.

r.  The G6 Defendants conducted frequent and unscheduled inspections of Motel 6 properties, including the Subject Motel 6.

s.  The G6 Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of the G6 Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Subject Motel 6.

t.  The G6 Defendants controlled all marketing for the Subject Motel 6 and prohibited franchisee from maintaining any online presence unless specifically reviewed and approved by the G6 Defendants.

u.  The G6 Defendants imposed detailed recordkeeping and reporting requirements on Defendant Franchisee regarding virtually all aspects of hotel operations.

v.  The G6 Defendants supervised and controlled day-to-day operations of the Subject Motel 6 through detailed information and extensive reports that it obtained through the property management system and other software systems it required Defendant Franchisee to use.

w.  The G6 Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

## VII.  Defendants are Jointly and Severally Liable for Jane Doe (C.L.F.)'s Damages.

81.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (C.L.F.).

82.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (C.L.F.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

### CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

83.    Jane Doe (C.L.F.) incorporates all other allegations.

**I.    Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendant)**

84.     Jane Doe (C.L.F.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

85.    Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because Franchisee Defendant:

a.    violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (C.L.F.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property.

b.    violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel property.

86.    Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (C.L.F.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**II.    Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

87.     Jane Doe (C.L.F.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

88.     Through acts and omissions described throughout this Complaint, Franchisor Defendant and Franchisee Defendant received a financial benefit from participating in a venture with traffickers, including Jane Doe (C.L.F.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (C.L.F.)'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendant and Franchisee Defendant are liable as a beneficiary under 18 U.S.C §1595(a).

89.     Through the acts and omissions described throughout this Complaint, Franchisor Defendant received a financial benefit from participating in a venture with its respective franchisee regarding the operation of its respective hotel property despite the fact that Franchisor Defendant knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

90.     Violations of 18 U.S.C §1595(a) by Franchisor Defendant and Franchisee Defendant as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (C.L.F.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

### III.     Cause of Action: Vicarious Liability for TVPRA Violations (Franchisor Defendant).

91.     Franchisee Defendant acted as the actual agent of its respective Franchisor Defendant when operating its respective hotel property.

34

92.     Through the acts and omissions described throughout this Complaint, Franchisor Defendant exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate its respective hotel property.

93.     Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

94.     Franchisor Defendant is vicariously liable for the TVPRA violations of its franchisee and the subagents of that franchisee.

95.     As alleged above, G6 is directly liable to Jane Doe (C.L.F.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Franchisee Defendant is also directly liable to Jane Doe (C.L.F.) under § 2255. G6 is vicariously liable to Jane Doe (C.L.F.) for those same violations.

## DAMAGES

96.     G6 and Franchisee Defendant's acts and omissions, individually and collectively, caused JANE DOE (C.L.F.) to sustain legal damages.

97.     G6 and Franchisee Defendant are joint and severally liable for all past and future damages sustained by JANE DOE (C.L.F.).

98.     JANE DOE (C.L.F.) is entitled to be compensated for personal injuries and economic damages, including:

   a.  Actual damages (until trial and in the future)

   b.  Direct damages (until trial and in the future)

   c.  Incidental and consequential damages (until trial and in the future)

   d.  Mental anguish and emotional distress damages (until trial and in the future)

   e.  Lost earnings and lost earning capacity (until trial and in the future)

f.   Necessary medical expenses (until trial and in the future)

g.   Life care expenses (until trial and in the future)

h.   Physical pain and suffering (until trial and in the future)

i.   Physical impairment (until trial and in the future)

j.   Unjust enrichment (until trial and in the future)

k.   Exemplary/Punitive damages.

l.   Attorneys' fees

m.  Costs of this action

n.   Pre-judgment and all other interest recoverable

### DISCOVERY RULE

99.     To the extent Defendants assert an affirmative defense of limitations, JANE DOE (C.L.F.) invokes the discovery rule. At the time she was harmed and through at least August 2013, JANE DOE (C.L.F.) was under coercion and control of traffickers who abused and manipulated her. Thus, JANE DOE (C.L.F.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, JANE DOE (C.L.F.) —through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was due to no fault on the part of C.J. but rather was a direct result of C.J. being kept under the control of her traffickers, which Defendants facilitated.

100.     At the time JANE DOE (C.L.F.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being

victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed..

101.    To the extent Defendants assert an affirmative defense of limitations, JANE DOE (C.L.F.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, JANE DOE (C.L.F.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before JANE DOE (C.L.F.) filed this lawsuit.

102.    To the extent Defendants assert an affirmative defense of limitations, JANE DOE (C.L.F.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

103.    JANE DOE (C.L.F.) was subject to continuous trafficking at the Subject Motel 6 through at least August 2013, which is not more than 10 years before JANE DOE (C.L.F.) filed this lawsuit.

104.    This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the Subject Motel 6 and Defendants' ongoing venture with one another and with criminal traffickers.

**JURY TRIAL**

105.    JANE DOE (C.L.F.) demands a jury trial on all issues.

**RELIEF SOUGHT**

106.    WHEREFORE, JANE DOE (C.L.F.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for JANE DOE (C.L.F.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit,

prejudgment interest, post-judgment interest, and such other and further relief to which JANE DOE

(C.L.F.) may, in law or in equity, show herself to be justly entitled.


Respectfully submitted,

**PROVOST ✶ UMPHREY LAW FIRM**

_____**/s/ Bryan O. Blevins, Jr.**_____

BRYAN BLEVINS  (SB 02487300)
MATT MATHENY  (SB 24039040)
COLIN MOORE (SB 24041513)
CLAIRE BROWN (SB 24108010)
350 Pine Street, Ste. 1100
Beaumont, TX 77701
Phone:  409/835-6000
bblevins@pulf.com
mmatheny@pulf.com
cmoore@pulf.com
cbrown@pulf.com


**ANNIE MCADAMS, PC**

ANNIE MCADAMS  (SB 24051014)
1150 Bissonnet
Houston, TX 77005
Phone:  713/785-6262
Fax:  866/713-6141
annie@mcadamspc.com